**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:25-CR-20262-DPG**

**UNITED STATES OF AMERICA**

**v.**

**TROY MURRAY**
     a/k/a "Steve Dixon",
                      **Defendant.**

                                /

## <u>SENTENCING MEMORANDUM</u>

The government submits this sentencing memorandum for defendant Troy Murray (hereinafter, the "defendant"), who is scheduled to be sentenced on May 28, 2026. The defendant pleaded guilty on January 7, 2026, to a one-count information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, in connection with a multi-year Jamaican Lottery Fraud ("JOLT") scheme that victimized millions of elderly American consumers. One related defendant, Troy Murray's son, Cutter Murray, pleaded guilty to money laundering, in violation of 18 U.S.C. § 1957(a), before the Honorable Cecelia Altonaga on September 25, 2025. He was sentenced to 33 months imprisonment on January 7, 2026.

For the reasons discussed below, the government recommends that the Court sentence defendant Troy Murray to 144 months of incarceration, which is a sentence within the applicable Guidelines range. The government believes this sentence would be a just result that is sufficient, but not greater than necessary, and appropriately accounts for the factors set forth in 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

The defendant admitted to these facts in support of his guilty plea:

Beginning by at least 2012, the defendant organized and maintained e-mail-ready lists of data to sell to individuals involved in lottery fraud schemes. These lists contained the names, phone numbers, and physical addresses, as well as in some cases, ages and email addresses, of elderly American consumers that may be easily targeted by get-rich-quick schemes such as lottery frauds. By in or about August 2016 and continuing into November 2023, in the Southern District of Florida and elsewhere, the defendant sold these lists to Jamaican scammers, among others, who perpetrated lottery fraud on elderly American consumers earning the defendant hundreds of thousands of dollars annually in ill-gotten gains from the sale of these data lists to fraudsters.

The defendant was a prolific and well-known lead list broker for Jamaican scammers. To complete the transactions, scammers would typically contact the defendant via phone call, email, or text message and request a list of names. The defendant would provide a price per list, typically $500 for 100 - 300 names. Initially, the defendant instructed scammers to provide payment via wire transfer; however, after multiple monetary wire transmission services blocked the defendant from using their services, he instructed scammers to send him pre-paid gift cards to pay for the lists. The defendant's list broker service was so well known that Jamaican music artist Valiant refers to the defendant's pseudonym, "Steve Dixon," in his 2022 song "Speed Off' saying "Steve just send me the leads. Ten mil a day at least."

After receiving payment, the defendant used the funds to purchase, among other things farm equipment, vehicles, collectibles such as bars and coins made of precious metals, and high-end, collectible Lego sets. In addition, during the charged course of conduct, the defendant sent fraudulent proceeds derived from the fraud scheme to one of his sons so that that son could purchase personal property as well as pay for his business and living expenses.

During the charged course of conduct, the defendant sent at least 22,000 lead lists to scammers containing the names and personal information of over 7 million elderly American consumers, which earned the defendant over $5.2 million. Based on information gathered during the investigation, the reasonably foreseeable loss caused to victims by the defendant related to the charged course of conduct was in excess of $9.5 million.

## GUIDELINES CALCULATION

In the Plea Agreement, the parties agreed that the defendant's United States Sentencing Guidelines range should be calculated, after acceptance of responsibility, at a Total Offense Level of 32. ECF No. 16, par. 9(a)-(f). If the Court adopts the agreed-upon Guidelines as set out in the Plea Agreement, the defendant's advisory guidelines range should be calculated at 121 – 151 months of incarceration. The United States Probation Office agrees that the defendant's advisory guidelines range should be 121 – 151 months.[1]

## SENTENCING FACTORS

When determining the appropriate sentence, the District Court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *See United States v. Gall*, 552 U.S. 3849 (2007). Pursuant to 18 U.S.C. § 3553(a), the court shall impose a sentence that is sufficient, but not greater than necessary to comply with the purposes of the statute which include the need for the sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed

---

[1] The Presentence Report filed on April 23, 2026, miscalculated the defendant's Total Offense Level at 30. This was due to the misapplication of the Zero Point Offender two-point downward adjustment found in Chapter 4 of the Sentencing Guidelines. The defendant is not eligible for the Zero Point Offender Adjustment because he is subject to the Vulnerable Victims adjustment found in §§3A1.1(b)(1)-(2) of the Guidelines. The parties jointly informed the U.S. Probation Office of the miscalculation, and the U.S. Probation Office agreed with the parties. The Final Presentence Report and Addendum to the Presentence Report (ECF No. 25) notes the corrected guidelines range.

educational or vocational training. In addition, the statute requires the court to consider a number of factors in determining the appropriate sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the purposes of the statute; (3) the kinds of sentences available; (4) the sentencing guidelines; (5) policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims.

### A.      Nature and Circumstances of the Offense

The offense that the defendant stands convicted of, and the course of conduct it represents, is unquestionably a serious one. For at least 7 years, the defendant operated an illicit list-broker business that led to the names and personal information of over 7 million seniors and elderly Americans being sold to Jamaican scammers. The defendant was so prolific that he simultaneously earned over $5.2 million in ill-gotten gains as well as a reputation for enriching Jamaican scammers.

Perhaps larger than the defendant's profits, though, was the damage the defendant's business caused. Beyond simply suffering a loss of privacy from having had their personal information sold to foreign actors, the elderly Americans who were ultimately defrauded because of the defendant's actions suffered deeply negative financial consequences. Specifically, the defendant caused victims to lose in excess of $9.5 million. Importantly, that figure represents pensions, social security payments, life savings, rainy day funds, and the money that was set aside to sustain the elderly for the rest of their lives.

In addition to losing significant sums of money, many senior citizen-victims lost a sense of trust, security, and peace as a result of the lottery schemes enabled by the defendant. This loss resulted because once scammers made their initial connection with victims, the victims would begin to receive repeated harassing phone calls in which they were asked for more money. The scammers also posed as government officials causing confusion and anxiety amongst victims. Finally, the

4

government's investigation found that some victims were even threatened and intimidated by scammers who now knew their addresses and used this knowledge in nefarious ways.

The nature of the defendant's scheme was so negatively impactful that it also led to his son, Cutter Murray, engaging in related criminal activity. The evidence shows that Cutter Murray laundered funds for his father's business. Between April 2018 and November 2023, Cutter Murray knowingly received over $1.6 million in fraudulent funds from his father, which Cutter Murray then used to enhance his lifestyle. Due to his role in his father's scheme, Cutter Murray was convicted of money laundering and sentenced by Chief Judge Altonaga to 33 months of imprisonment.

### B.      History and Characteristics of the Defendant

A guidelines sentence is also appropriate in light of the history and characteristics of the defendant. Importantly, the defendant had many opportunities to cease his illegal course of conduct. In 2015, for example, law enforcement warned the defendant's son, Cutter Murray, that they were aware the defendant's business was related to fraud and that he was involved. Cutter Murray then informed the defendant that federal law enforcement had interviewed him and was aware of their illicit activities. Although the defendant and his son understood that warning, they continued to engage in their respective roles within the scheme.

Beyond ignoring law enforcement's warning to his son, the defendant also persisted in his course of conduct when multiple monetary wire transmission services blocked him from using their services. Undeterred by these roadblocks, the defendant simply found a different transmitter service before eventually instructing the scammers to send him prepaid gift cards to pay for the lists he sold them.

Ultimately, the defendant deserves credit for his clear demonstration of acceptance of responsibility. So, too, does he deserve credit for timely notifying the government of his intention to plead guilty promptly, which assisted the government in investigating his conduct. However,

the severity and scope of his behavior, in addition to his willingness to persist through the warnings and opportunities to cease his illegality make a guidelines sentence appropriate in this case. It will both specifically deter this defendant from re-engaging in such criminal conduct after his release and other list brokers who would seek to profit from scams that target the elderly.

**CONCLUSION**

For the reasons stated above, the government recommends a sentence of 144 months of imprisonment. A sentence of 144 months is just and sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a). Such a sentence would appropriately reflect the seriousness of the offense, provide deterrence to others who would seek to defraud elderly American citizens, protect vulnerable members of society, and promote respect for the law.

Dated: May 25, 2026                     Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

LORINDA I. LARYEA
Chief
Fraud Section, Criminal Division
U.S. Department of Justice

Ryan E. Norman
Trial Attorney
Court ID No. A5502913
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Ave., NW, RM 1206
Washington, D.C. 20530
(202) 532-4110
ryan.norman@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 25, 2026, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing

to all counsel of record.

RYAN E. NORMAN
Trial Attorney